1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10    JAMES H. FISHER,

11            Plaintiff,                         No. CIV S-05-0540 MCE EFB P

12        vs.

13    N. DIZON, et al.,                          FINDINGS AND RECOMMENDATIONS

14            Defendants.

15    _____/

16        Plaintiff is a prisoner without counsel suing for alleged civil rights violations.  *See* 42

17    U.S.C. § 1983.  Currently before the court is defendants' February 2, 2007, motion for summary

18    judgment.  Plaintiff has filed an opposition.

19        Plaintiff's March 31, 2005, verified complaint alleges that defendants violated his Eighth

20    Amendment rights based on the following allegations: (1) on March 4, 2004, at around 12:30

21    a.m., Dizon and other guards awoke plaintiff and flung pocket knives in the area of plaintiff's

22    bed; (2) on March 4, 2004, at around 4:30 a.m., defendants Dizon and Powers returned to

23    plaintiff's bunk, awoke him and flung pocket knives in the area of plaintiff's bed; (3) at around

24    12:35 a.m., on March 5, 2004, Dizon approached plaintiff's bunk, shone a light in plaintiff's

25    eyes, held a knife over plaintiff's head, shook the bunk and poked plaintiff twice in the buttocks;

26    (4) at around 4:30 a.m. on March 5, 2004, plaintiff complained about Dizon to defendant

1

Powers, who refused to take action to protect plaintiff from Dizon; and, (5) nine days later, on March 14, 2004, defendant Dizon assaulted and battered plaintiff with the assistance of Anunciacion, Barrientos, Mendoza, Rosales and Swan, causing plaintiff to suffer bruises and cuts.

Defendants contend that plaintiff cannot produce evidence to create a genuine issue for trial as to whether they used excessive force.  For the reasons explained below, the court finds that with respect to the first two claims, there is no genuine issue for trial.  With respect to the other three claims, plaintiff has established a genuine issue of material fact as to the claims against Dizon and Powers.

## I.      Plaintiff's Rule 56(f) Request

Plaintiff seeks additional time for discovery.  Pl.'s Opp'n, at 3.  Although he states that he does not make this request pursuant to Rule 56(f), that rule governs a request to postpone summary judgment to permit a party to conduct additional discovery.  Plaintiff asserts that defendants' counsel did not produce documents that plaintiff duly requested.  He asserts that these records will show that other prisoners and civilians have filed complaints against defendants alleging acts of violence, retaliation and the falsification of records.  *Id*., at 4.  Plaintiff states that defendant Powers was demoted shortly after plaintiff filed a grievance about the conduct he alleges in his complaint.  *Id*., at 4-5.  He also asserts that the documents he seeks will establish that defendants operate under a "Code of Silence."  *Id*., at 5.

As to the contention that other persons have filed complaints alleging retaliation, further discovery by plaintiff to gather evidence to oppose this motion is unnecessary.  The court finds that the retaliation claim survives summary judgment.

As to the first two claims, plaintiff fails to satisfy the requirements of Rule 56 (f).  A court may deny a motion for summary judgment or postpone ruling on the motion to permit further discovery when an opposing party shows by affidavit that it cannot present facts essential to justify the party's opposition.  Fed. R. Civ. P. 56(f).  As the party opposing summary

judgment, plaintiff's burden to prevail on this motion is high:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f). This standard requires the party seeking a continuance to "identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of San Fransisco*, 441 F.3d 1090, 1100 (9th Cir. 2006). Plaintiff's request to continue summary judgment in order to permit further discovery is not based on an affidavit. Furthermore, his reasons are too general. That other people have complained about defendants is not a specific fact without which plaintiff could not oppose defendants' motion. Rather, at best, it is character evidence with limited admissibility at trial. Plaintiff has not show by affidavit what specific discovery he proposes and how that discovery would lead to evidence which would satisfy his burden in opposing summary judgment. Thus, plaintiff's Rule 56(f) request must be denied.

## II.    Facts

At all times relevant to this action, plaintiff was a prisoner confined at the California Medical Facility ("CMF"), and housed in Dorm 1 in Unit H-3 with 11 other prisoners. Defs.' Mot. for Summ. J., Exs. filed in Supp. Thereof ("Defs.' Ex."), Ex. A, Incident Report of 3/14/2004; Dizon Decl., ¶ 26. All defendants were employed at CMF. Defendants Dizon and Anunciacion were first watch relief[1] officers in plaintiff's housing unit. Dizon Decl., ¶ 1-2; Anunciacion Decl., ¶ 1-2. Defendant Rosales was the regular first watch officer on plaintiff's housing unit. Rosales Decl., ¶ 2. Defendant Mendoza was a housing officer on Housing Wing L-3. Mendoza Decl., ¶ 2. Swan was the first watch officer for the administrative segregation unit. ¶ 2. Barrientos was a floor officer on plaintiff's housing unit. Barrientos Decl., ¶ 2-3.

---

[1] A "relief officer" covers for a regular officer when the latter is not at work. Rosales Decl., ¶ 3.

Defendants' motion necessitates some explanation of the process for counting prisoners. Relevant here is the "positive count," i.e., counting "the actual number of inmates that each respective staff member has counted and reported to Central Control." Defs.' Ex. B, CDCR Departmental Operations Manual ("DOM") 520204.3. Prisoners must be counted at least four times each day at times established in the DOM. DOM 52020.4. Thus, positive counts are to be conducted between 12:30 a.m. and 1:00 a.m.; 4:30 a.m. and 5:30 a.m.; 4:00 p.m. and 5:00 p.m.; and 9:00 p.m. and 10:00 p.m. DOM 52020.4.1. During what is known as a "standing count," which is done between 4:00 p.m. and 5:00 p.m., "inmates housed in cells shall stand upright at their cell door and shall remain standing until counted by the officer conducting the count." DOM 52020.4.2. Prisoners "housed in dormitories equipped with double tier bunks, shall remain seated on their assigned bunk until the count is completed by the officer." DOM 52020.4.3. No document specifies when a count is "completed." However, defendants assert that prisoners must remain on their bunks until guards finish counting and the last officer has left the dormitory. Kaplan Decl., ¶ 10; Dizon Decl., ¶ 14. Guards counting prisoners must "ensure that the individual inmate is awake, breathing and responsive." Defs.' Ex. C, California Medical Facility Operational Procedure ("OP") 4, at 4. A prisoner will not be counted if staff is "unable to confirm the inmate being counted is alive and breathing." OP 4, at 4.

Defendants submit evidence in the form of Dizon's declaration explaining the security precautions taken during a positive count made on first watch. To count prisoners in a dormitory, guards must enter the dormitory. One guard remains in the main hall outside the housing wing. Dizon Decl., ¶ 9. The door leading into the housing wing remains locked, and the "key" officer holds the keys for all the wings, dormitories and cells where prisoners are to be counted. *Id.* To count the prisoners in a dormitory, the guard stationed in the hallway unlocks the door to the dormitory, two to four guards enter, and the wing officer locks the door after them. *Id.*, ¶ 10. One guard, the "wing officer," counts the prisoners while the other officers, "cover officers," protect him. *Id.* Since it was dark in the dormitory, Dizon used a flashlight to

verify that each prisoner was present and alive, and while it was not his practice to shine the light in a prisoner's eyes, it could have happened on occasion. *Id.*, ¶ 25.   Dizon asserts that during counts he does not touch a sleeping prisoner with his hand or any object because startling a sleeping prisoner can lead to a dangerous incident.   Dizon Decl., ¶ 24.

Compounding prison officials' concerns for security during a count was a habit of prisoners, at the time of these events in dispute here, of hanging "curtains" on clotheslines around their bunks.   Dizon Decl., ¶¶ 15, 16; Rosales Decl., ¶ 13; Swan Decl., ¶ 11.   This practice required the wing officer to move whatever was hanging on the line.   Dizon Decl., ¶ 15.   Thus, Sergeant Powers authorized guards to cut down curtains and clotheslines that hindered the ability to count prisoners. *Id.*, at 17; Rosales Decl., ¶ 14; Swan Decl., ¶ 11.   Dizon asserts that he carried what is known as a "cut down tool," which he used for cutting curtains and clotheslines to facilitate the count. *Id.*, at 18.   A "cut down tool" has the shape of "a curved version of the number six," and specifically is designed to cut a noose in order to prevent a suicide. *Id.*   The lower part of the tool is an oval-shaped handle of about 3/4 of an inch thick. *Id.*   The top part is curved, about 3/4 of an inch thick with "a razor-like device angled upward toward the center inside curve of the top of the 'six.'" *Id.*   This upper, sharp portion is used for cutting. *Id.*   Dizon denies ever having used anything other than a cut down tool to cut an prisoner's clothesline. Dizon Decl., at  ¶ 22.   At deposition, plaintiff explained that the instrument was like a box cutting tool.   Defs.' Ex. G, Dep. of Plaintiff ("Pl.'s Dep."), at 14.

For the most part, defendant Dizon avoids the use of specific dates in his declaration.   He states that about a week before the March 14, 2004, incident, when Dizon cut plaintiff's clothesline on which a sheet was hanging, plaintiff began pulling on the sheet.   Dizon Decl., ¶ 23.   Dizon tugged back, but ultimately let go in order to avoid a violent incident. *Id.*   That day, plaintiff complained to Sgt. Powers about the what had happened. *Id.*   Dizon denies knowing who plaintiff was before this incident. *Id.*

////

1      On March 4, 2004, during "first watch," guards conducted two positive counts.  Kaplan

2  Decl., ¶¶ 5-6.  They completed the first count by approximately 1:00 a.m., and the second by

3  approximately 5:00 a.m.  *Id.*  In the verified complaint, plaintiff alleges that at around 12:30

4  a.m., he was awakened by unspecified staff "and Dizon wielding and flinging knives in my bed

5  area, and snatching on the bunk as they cut away my towel line."  Compl., at 4.  At deposition he

6  retracted this allegation stating that Dizon did not thrust the knife.  Pl.'s Dep., at 14.  Rather,

7  Dizon "used the cutting knife on string.  He cut away a string.  He cut away a towel, my towel

8  string."  *Id*.  Plaintiff admitted that at this time he did not see the cutting tool.  *Id*., at 17.  He just

9  felt the bunk move when the string was cut away.  *Id*.  At 4:30 a.m., the same guards returned

10  with the sergeant, defendant Powers.  *Id.*  As they approached plaintiff's bunk, Dizon pointed at

11  plaintiff and said, "That's him."  Compl., at 5.  Powers then took a knife out of his pocket and

12  cut a clothesline from plaintiff's bunkmate's bed with such force as to shake the entire bunk bed.

13  *Id.*      Defendant Dizon does not specify a date, but does not dispute that at least once during

14  the first week of March 2004, he was working the first positive count of the first watch.  Dizon

15  Decl., ¶ 23.  He used a "cut down" tool to cut a clothesline on plaintiff's bunk.  Dizon Decl.,

16  ¶ 23; Swan Decl., ¶¶ 14-15.  Plaintiff had hung a sheet on the line, and the sheet obstructed the

17  view of plaintiff's bunk.  Dizon Decl., ¶ 23; Swan Decl., ¶¶ 14-15.  While Dizon was cutting the

18  sheet, plaintiff began to pull on it.  Dixon Decl., ¶ 23; Swan Decl., ¶¶ 14-15.  This continued so

19  that they essentially were in a tug-of-war.  Eventually, Dizon let plaintiff have the sheet so as to

20  avoid having the situation escalate.  Dixon Decl., ¶ 23; Swan Decl., ¶¶ 14-15.  The court

21  construes these facts as pertaining to the first incident on March 4 because this was the only time

22  it appears that Dizon cut a clothesline attached to plaintiff's bunk.

23      The verified complaint also alleges that on March 5, 2004, at around 12:35 a.m., Dizon

24  and other, unidentified guards returned.  Compl., at 5.  Plaintiff was awake.  *Id.*  His towel was

25  folded and on the floor.  *Id.*  He had nothing hanging up, but "Dizon walked up to my head area

26  and shined his high-intensity flash light directly into my eyes."  *Id.*  Plaintiff blocked the light

with one hand.  Dizon shook the bunk with the hand in which he was holding a knife.  *Id.*  Dizon

then went to the other side of the bunk, shook the bunk with both hands, poked plaintiff in the

buttocks and walked away.  *Id.*  Plaintiff asserts that the second poke "penetrated the crack and

cheeks" of his buttocks.  Compl., at 6.  At deposition, plaintiff testified that Dizon touched him

with some object, which could have been a baton or a flashlight.  Pl.'s Dep., at 35.

Again, on March 14, 2004, during the first positive count on the first watch, Dizon cut

down a clothesline that was on plaintiff's bed and told plaintiff that clotheslines were not

permitted.  Dizon Decl., ¶ 28.  Dizon asserts that thereafter, he stood near the restroom door,

which was about seven to ten feet from the door leading out of the dormitory.  *Id.*  The other

guards walked past him into the hallway.  *Id.*, ¶ 29.  Dizon ensured that all staff walked out the

door, and then he began to walk toward the door, looking behind him as he went.  *Id.*  Plaintiff

took hold of his cane and walked toward Dizon.  *Id.*, ¶ 30; Compl., at 9.  Rosales, the key person

during that count, saw plaintiff leave his bunk.  Rosales Decl., ¶¶ 6, 7.  Dizon twice ordered

plaintiff to stop.  Dizon Decl., ¶ 30; Mendoza Decl., ¶¶ 7-8.  Dizon thought that plaintiff was

upset because Dizon had cut his clothesline.  Dizon Decl., ¶ 31.  When plaintiff was about two

feet away from him, Dizon grabbed plaintiff.  Dizon Decl., ¶ 33; Mendoza Decl., ¶ 8.  Mendoza

heard a scuffle in the dormitory and ran inside, where he recovered a cut down tool one of the

other guards pushed across the floor away from the scuffle.  Mendoza Decl., ¶¶ 7-8; Rosales

Decl., ¶ 9.  Mendoza suggested removing plaintiff from the dorm.  Mendoza Decl., ¶ 9; Dizon

Decl., ¶ 34.  The other prisoners in the dormitory began to awaken and become agitated.  Dizon

Decl., ¶ 35; Mendoza Decl., ¶ 9.  As Dizon held plaintiff, who was the larger of the two, from

behind, plaintiff spun him around with such force that Dizon's feet left the ground.  Dizon Decl.,

¶¶ 34, 36; Rosales Decl., ¶ 10.  Dizon became caught in the utility belt of another guard, Rosales,

and broke Rosales's radio holder.  Dizon Decl., ¶ 36; Rosales Decl., ¶ 10.  Dixon and Mendoza

maneuvered plaintiff out of the dormitory, and both plaintiff and Dizon fell to the ground.  Dizon

Decl., ¶ 37; Mendoza Decl., ¶¶10, 12; Rosales Decl., ¶ 11.  Another guard, Swan, was

1   performing a security check in a different unit when he saw the officers struggling with a

2   prisoner in plaintiff's unit.  Swan Decl., ¶¶ 6-7.  Swan ran into the main hallway, blew his

3   whistle and commanded Anunciacion to sound his alarm.  *Id.*  Mendoza saw a pen in plaintiff's

4   right hand, and ordered plaintiff to release it.  Mendoza Decl., ¶ 12.  Plaintiff did not obey the

5   order, and Mendoza pried the pen from his hand.  *Id.*  Other staff placed plaintiff into mechanical

6   restraints.  Dizon Decl., ¶ 39; Defs.' Ex. A, Incident Report of 3/14/2004.  Anunciacion denies

7   touching plaintiff on March 14, 2004.  Anunciacion Decl., ¶7.

8          In contrast to defendants' version of events, the verified complaint alleges that Dizon and

9   others kicked his bunk during the count, and that after the guards, Dizon being the last, had left

10  the dormitory, plaintiff took his cane and started walking towards the bathroom.  Compl., at 9.

11  He alleges that when he was about 3-5 feet from the bathroom, Dizon ran back into the

12  dormitory, stood by the bathroom door and commanded plaintiff to stop.  *Id.*  Plaintiff stopped,

13  Dizon then told the guard at the door to "hit his button," presumably the alarm, and grabbed

14  plaintiff's left arm.  *Id.*  Another guard grabbed plaintiff's right hand, and Dizon said they should

15  take plaintiff down in the hallway.  *Id.*  They carried plaintiff out the door, Dizon hit plaintiff in

16  the face, knocking off his glasses, and then grabbed plaintiff around the neck.  *Id.*  Plaintiff

17  obeyed a different officer's order to "just relax and go down."  *Id.*, at 10.  "Dizon then re-applied

18  his choke hold on me as someone was kicking me in the back and legs."  *Id.*  Ultimately, Dizon

19  released plaintiff on the command of a sergeant who is not a defendant in this action.  *Id.*

20         The parties agree, however, that after plaintiff was restrained, guards took him to the

21  medical clinic.  Rosales Decl., ¶ 15; Anunciacion Decl., ¶ 10.  At this point, Rosales and

22  Anunciacion collected plaintiff's property, which was substantial.  Rosales Decl., ¶ 15;

23  Anunciacion Decl., ¶ 10.  These officers did not confiscate any of plaintiff's property, but items

24  such as empty body oil containers would have been considered garbage and been thrown away.

25  Rosales Decl., ¶ 16.  Rosales, Barrientos, Anunciacion and Swan all categorically deny touching

26  plaintiff on March 14, 2004.  Rosales Decl., ¶ 18; Barrientos Decl., ¶ 25; Anunciacion Decl., ¶ 7;

1   Swan Decl., ¶¶ 5-7, 9.

2          Plaintiff submits evidence in the form of a declaration by a fellow prisoner, Roderick

3   Green, that prisoners did move around once guards had finished counting but before they left the

4   dormitory.  Mr. Green asserts that from about May 1, 2004, until October 14, 2004, he was

5   housed in the same unit as plaintiff.  Pl.'s Opp'n, Ex. B, Green Decl., ¶ 1.  When guards began to

6   count prisoners at about12:30 a.m., he would walk to his bunk, and once he had been counted he

7   would go to another part of the dormitory or to the bathroom while the count continued.  Green

8   Decl., ¶ 2.  Guards never scolded Green or ordered Green back to his bunk, even when he

9   followed them to the door as they left.  *Id*., ¶¶ 4-5.

10  **II.      Standards on Summary Judgment**

11         Summary judgment pursuant to Fed. R. Civ. P. 56(a) avoids unnecessary trials in cases

12  with no disputed material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of*

13  *Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a

14  sufficient disagreement to require submission to a jury or whether it is so one-sided that one

15  party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

16  (1986).  Rule 56 serves to screen the latter cases from those which actually require resolution of

17  genuine disputes over facts material to the outcome of the case; e.g., issues that can only be

18  determined through presentation of testimony and evidence at trial such as credibility

19  determinations of conflicting testimony over dispositive facts.

20              In three recent cases, the Supreme Court, by clarifying what the
            non-moving party must do to withstand a motion for summary
21          judgment, has increased the utility of summary judgment. First, the
            Court has made clear that if the non-moving party will bear the
22          burden of proof at trial as to an element essential to its case, and
            that party fails to make a showing sufficient to establish a genuine
23          dispute of fact with respect to the existence of that element, then
            summary judgment is appropriate.  *See Celotex Corp. v. Catrett*,
24          477 U.S. 317 (1986).  Second, to withstand a motion for summary
            judgment, the non-moving party must show that there are "genuine
25          factual issues that properly can be resolved only by a finder of fact
            because they may reasonably be resolved in favor of either party."
26          *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis

9

added).  Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

Thus, to overcome summary judgement an opposing party must show a dispute that is both genuine, and involving a fact that makes a difference in the outcome.  Two steps are necessary.  First, according to the substantive law, the court must determine what facts are material.  Second, in light of the appropriate standard of proof, the court must determine whether material factual disputes require resolution at trial.  *Id.,* at 248.

When the opposing party has the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim.  *See e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  The moving party need only point to matters which demonstrate the absence of a genuine material factual issue.  *See Celotex v. Cattret*, 477 U.S. 317, 323-24 (1986).

If the moving party meets its burden, the burden shifts to the opposing party to establish genuine material factual issues.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586.[2]  The opposing party must demonstrate that the disputed facts are material, i.e., facts that might affect the

---

[2]  On August 5, 2005, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1   outcome of the suit under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc.*

2   *v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are

3   genuine, i.e., the parties' differing versions of the truth require resolution at trial, *see T.W. Elec.*,

4   809 F.2d at 631.  There can be no genuine issue as to any material fact where there is a complete

5   failure of proof as to an essential element of the nonmoving party's case because all other facts are

6   thereby rendered immaterial.  *Celotex*, 477 U.S. at 323.  The opposing party may not rest upon the

7   pleadings' mere allegations or denials, but must present evidence of specific disputed facts.  *See*

8   *Anderson*, 477 U.S. at 248.[3]  Conclusory statements cannot defeat a properly supported summary

9   judgment motion.  *See Scott v. Rosenberg*, 702 F.2d 1263, 1271-72 (9th Cir. 1983).

10       The court does not determine witness credibility.  It believes the opposing party's

11   evidence, and draws inferences most favorably for the opposing party.  *See Anderson*, 477 U.S. at

12   249, 255.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce

13   evidence of a factual predicate from which to draw inferences.  *American Int'l Group, Inc. v.*

14   *American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*,

15   477 U.S. at 322).

16       If reasonable minds could differ on material facts at issue, summary judgment is

17   inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other

18   hand,"[w]here the record taken as a whole could not lead a rational trier of fact to find for the

19   nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation

20   omitted).  In that case, the court must grant summary judgment.

21       With these standards in mind, it is important to note that plaintiff bears the burden of

22   proof at trial over the issue raised on this motion, i.e., whether the defendant acted with deliberate

23   indifference to the plaintiff's safety.  Equally critical is that "deliberate indifference" is an

24

25       [3]  A verified complaint may be used as an affidavit in opposition to the motion.
26   *Schroeder v McDonald*, 55 F. 3d 454, 460 (9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196,
     197-98 (9th Cir. 1987) (per curiam).

1   essential element of plaintiff's cause of action.  Therefore, to withstand defendant's motion,

2   plaintiff may not rest on the mere allegations or denials of his pleadings.  He must demonstrate a

3   genuine issue for trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he

4   must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the

5   evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

6   **III.   Analysis**

7       "As to materiality, the substantive law will identify which facts are material.  Only

8   disputes over facts that might affect the outcome of the suit under the governing law will properly

9   preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  Here, plaintiff's action

10   arises under 42 U.S.C. Section 1983 and the Eighth Amendment.  To prevail he must prove that

11   the defendant deprived him of his Eighth Amendment rights while acting under color of state law.

12   To prove that defendants used force that violated the Eighth Amendment, he must prove by a

13   preponderance of the evidence that they used force maliciously and sadistically solely for the

14   purpose of causing plaintiff physical harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).   As

15   discussed below, plaintiff has failed to demonstrate a genuine dispute for trial over this material

16   issue for his first two claims, but has demonstrated such a dispute with respect to his other claims.

17       As noted above, plaintiff alleges that at around on March 4, 2004 at 12:30 a.m., and

18   March 4, 2004, at 4:30 a.m., Dizon, Powers and other guards awoke plaintiff and flung pocket

19   knives in the area of plaintiff's bed.  He claims that on March 5, 2004, at 12:35 a.m., Dizon shone

20   a light in plaintiff's eyes, held a knife over his head, shook the bunk and poked plaintiff twice in

21   the buttocks.  He also claims that on March 5, 2004, at 4:30 a.m., he complained about Dizon to

22   defendant Powers, who refused to take action, and nine days later on March 14, 2004, defendant

23   Dizon assaulted and battered plaintiff with the assistance of Anunciacion, Barrientos, Mendoza,

24   Rosales and Swan, causing plaintiff to suffer bruises and cuts.

25       Harsh conditions of confinement, including the use of force, will not violate the Eighth

26   Amendment if the conditions are "part of the penalty that criminal offenders pay for their offenses

1   against society." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Rhodes v. Chapman*, 452 U.S. 337,

2   347 (1981).  Not every "malevolent touch by a prison guard" violates the Eighth Amendment.

3   *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  Therefore, "*de minimis* uses of physical force" are

4   not unconstitutional unless it of a sort that is "repugnant to the conscience of mankind." *Whitley*,

5   475 U.S. at 327.  What violates the Eighth Amendment is "the unnecessary and wanton infliction

6   of pain," i.e., infliction of suffering that is "totally without penological justification." *Rhodes*,

7   452 U.S. at 346.  Whether an Eighth Amendment violation has occurred depends upon the mental

8   state of the defendant together with objective indicia surrounding the condition or suffering

9   showing its relationship to the purpose of imprisonment.  *Id.*  The touchstone for any Eighth

10  Amendment analysis, however, is whether the condition can be said to run afoul of

11  "contemporary standards of decency. " *Rhodes*, 452 U.S. at 347.  When force is used against a

12  prisoner, the question "whether the measure taken inflicted unnecessary and wanton pain and

13  suffering ultimately turns on whether force was applied in a good faith effort to maintain or

14  restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*,

15  475 at 320-21; *see also Hudson*, 503 U.S. at 9. "When prison officials maliciously and

16  sadistically use force to cause harm, contemporary standards of decency always are violated,"

17  regardless of whether the resulting injury is significant. *Hudson*, at 9.  In other words, "the use of

18  excessive physical force against a prisoner may constitute cruel and unusual punishment when the

19  inmate *does not suffer serious injury*." *Hudson*, 503 U.S. at 4 (emphasis added).  "Otherwise, the

20  Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman,

21  inflicting less than some arbitrary quantity of injury." *Id.*  Therefore, the extent of injury suffered

22  is just "one factor that may suggest whether the use of force could plausibly have been thought

23  necessary in a given situation, or instead evinced such wantonness with respect to the unjustified

24  infliction of harm as is tantamount to a knowing willingness that it occur." *Id.*, at 7.  When

25  determining whether the force used was excessive, the court must consider (1) the need to use

26  force, (2) the relationship between that need and the amount of force used, (3) the threat

1   reasonably perceived by prison officials, (4) any effort made to temper the forceful response, and

2   (5) the extent of the injury suffered by the inmate.  *Id.* at 7.  With this background and these

3   standards in mind, the court turns to the facts of this case.

4         **A.  Incident of March 4, 2004, at 12:30 a.m.**

5         Defendant Dizon contends that plaintiff cannot present evidence that he used force beyond

6   that necessary to accomplish a legitimate security measure, i.e., cutting down a clothesline.

7   Plaintiff fails to demonstrate a genuine issue for trial over this incident.  It is undisputed that

8   plaintiff had a clothesline across his bunk with a towel hanging from it.  Such "curtains" made it

9   difficult to count prisoners because the counting guard had to ensure that a prisoner was present

10  and alive.  Also, these "curtains" posed a security risk in that a prisoner behind a curtain could

11  commit some malfeasance unseen or render the officer and the inmate vulnerable to attack.  In the

12  verified complaint, plaintiff alleges that Dizon flung a pocket knife at him.  At deposition,

13  however, plaintiff conceded that Dizon did no such thing.  Rather, Dizon cut the clothesline

14  hanging from plaintiff's part of the bunk.  Plaintiff's concession that Dizon did not in any way

15  misuse a knife or other sharp object is fatal to this claim.  He cannot prove an essential element of

16  his case, i.e., that Dizon used constitutionally excessive force.  On the evidence before the court,

17  no jury could find in plaintiff's favor on this claim.  Dizon is entitled summary judgment on this

18  claim.

19        **B.  Incident of March 4, 2004, at 4:30 a.m.**

20        Similarly, there is no genuine issue about whether Dizon and Powers used force

21  sadistically and maliciously for the purpose of causing harm.  Plaintiff presents no evidence to

22  support this claim.  It is undisputed that Dizon and Powers returned to plaintiff's bunk at around

23  4:30 a.m.  It also is undisputed that when they did, Powers cut the clothesline of plaintiff's bunk-

24  mate just as he was required to do.  In doing so, Powers shook the entire bed.  While excessive

25  force directed at one prisoner can also establish a cause of action for harm that befalls other

26  prisoners, s*ee Robins v. Meecham*, 60 F.3d 1436, 1441-42 (9th Cir.1995), plaintiff has not

1   presented evidence to prevail on this claim.  He alleges in the verified complaint that defendant

2   Dizon approached plaintiff's bunk, pointed to him and said to defendant Powers, "That's him."

3   However, plaintiff makes no connection between Dizon's words apparently directed at plaintiff

4   on the one hand, and Powers' cutting a different prisoner's clothesline on the other.  Furthermore,

5   while there is evidence that Powers shook the entire bunk when he cut the clothesline, there is no

6   evidence he did so only to cause harm.  *See Robins*, 60 F.3d at 1440 (recognizing that intent to

7   harm is an essential element of any excessive force claim under the Eighth Amendment).  Given

8   that the "cut down tool" appears to be an awkward tool requiring some force to actually cut a

9   rope, it is not surprising that the bunk shook substantially when Powers used it.  On this evidence,

10  no reasonable jury could find in plaintiff's favor on this claim this constituted a use force

11  sadistically and maliciously for the purpose of causing harm.  Accordingly, Dizon and Powers are

12  entitled to judgment as a matter of law on this claim.

13          **C.  Incident of March 5, 2004**

14          Again, plaintiff's allegations with respect to the events of this date are inadequate to

15  survive summary judgment.  Dizon does not in his motion directly address plaintiff's detailed

16  allegations of what occurred on this date.  However, plaintiff alleges that on March 5, 2004, at

17  around 12:35 a.m., Dizon and other, unidentified guards approached his bunk.  Compl., at 5.

18  Plaintiff was awake, and his towel was folded and on the floor.  *Id.*  Nothing obscured the view of

19  plaintiff's bunk, but "Dizon walked up to my head area and shined his high-intensity flash light

20  directly into my eyes" and held a knife above plaintiff's head.  *Id.*   Using the hand in which he

21  was holding a knife, Dizon shook the bunk.  *Id.*  Dizon then went to the other side of the bunk,

22  shook the bunk with both hands, poked plaintiff in the buttocks twice and walked away.  *Id.*

23  Plaintiff asserts that the second poke "penetrated the crack and cheeks" of his buttocks.  *Id.*, at 6.

24          Dizon has submitted evidence that it was his practice to avoid shining his flashlight

25  directly into prisoners' eyes, but he does not deny that he did so on this particular occasion.

26  ////

There is evidence that in order to count a prisoner, the wing guard must be sure that the prisoner is both present and alive.  However, Dizon concedes that such confirmation may be made by observing the prisoner move an arm or leg, or even by the rise and fall of the prisoner's chest as he breathes.  He asserts that if a prisoner was covered in bedding, he would gently tap the bunk with his flashlight.

Significantly here, not every "malevolent touch by a prison guard" constitutes constitutionally excessive force.  *Hudson*, 503 U.S. at 9.  Thus, shaking plaintiff's bunk and shining light in his eyes do not in themselves constitute excessive force.  However, for Eighth Amendment purposes, "[w]antonness does not have a fixed meaning, but rather must be determined in relation to the type of conduct on which the suit is based." *Robins*, 60 F.2d at 1440.  Neither does Dizon's poking plaintiff in the buttocks meet that standard.[4]  Accordingly Dizon's motion must be granted as to this claim.

### D.  Powers' Failure to Protect Plaintiff

Plaintiff alleges that Powers knew that Dizon was harassing plaintiff such that plaintiff feared substantial physical harm.  Powers has not moved for summary judgment and the court does not address this claim.

### E.  Incident of March 14, 2004

Defendants Dizon, Rosales, Mendoza, Swan and Anunciacion contend that plaintiff cannot demonstrate a genuine issue with respect to whether Dizon used force "maliciously and sadistically" for the very purpose of causing harm on March 14.  The court addresses this question first with respect to Dizon and then with respect to the other defendants.

There is a genuine issue of material fact as to this claim.  It is undisputed that plaintiff left his bunk after he personally had been counted and while Dizon was leaving but still inside the

---

[4]  There can be no doubt that sexual abuse is wanton, and prisoners have a right to be free from such abuse at the hands of guards.  *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000).  However, plaintiff has not alleged facts which show that this incident amounted to such abuse.

1   dormitory.  It also is undisputed that plaintiff walked in the direction of Dizon.  Dizon has

2   submitted evidence that plaintiff walked to within two feet of him, seemed agitated and disobeyed

3   two orders to stop.  His evidence also shows that while he and the cover guards were still inside

4   the dormitory, a scuffle ensued between plaintiff, Dizon and Mendoza.  This account contrasts

5   sharply with plaintiff's account in the verified complaint.

6          Plaintiff version of the event is that he took hold of his cane and started walking towards

7   the bathroom after the cover guards had exited the dormitory, but while Dizon was inside the

8   dormitory near the door.  He alleges that when he was about 3-5 feet from the bathroom Dizon

9   ran back into the dormitory, stood by the bathroom door and commanded plaintiff to stop.

10  Plaintiff obeyed, but Dizon then told another guard to "hit his button," (presumably an alarm),

11  and grabbed plaintiff's left arm.  Another (unidentified) guard grabbed plaintiff's right hand, and

12  Dizon said they should take plaintiff down in the hallway.  They carried plaintiff into the hallway,

13  where Dizon hit plaintiff in the face twice, knocking off plaintiff's glasses, and grabbed plaintiff

14  around the neck.  Plaintiff obeyed a different officer's order to "just relax and go down."  Compl.,

15  at 10.  Plaintiff states that, "Dizon then re-applied his choke hold on me as someone was kicking

16  me in the back and legs."  Ultimately, Dizon released plaintiff on the command of a sergeant who

17  is not a defendant in this action.  *Id*.

18         Obviously, plaintiff and Dizon provide conflicting accounts and their factual disputes are

19  material.  Within these divergent versions of the events are few basic agreed-upon facts.  The

20  parties agree that plaintiff left his bunk after having been counted.  But they disagree about what

21  he was doing, his demeanor and the level of the security breach.  Dizon contends that plaintiff

22  approached him in an agitated manner.  Plaintiff maintains that he was merely walking towards

23  the bathroom.  The level of security concern over this is also unclear.  Plaintiff presents evidence

24  that a different prisoner regularly strolled through the dormitory during the count suggests that

25  prisoner movement was not such a serious matter.  Dizon's evidence suggests that he did not

26  leave the dormitory until he and another guard removed plaintiff while attempting to subdue him.

1   Plaintiff's version is that Dizon had just left the dormitory and suddenly reentered for the sole

2   purpose of attacking plaintiff.  Finally, Dizon does not deny twice hitting plaintiff or twice putting

3   plaintiff in a choke-hold.  Both the need for force and the actual amount of force used are in

4   dispute.  Thus, there is a genuine issue for trial about whether Dizon used excessive force against

5   plaintiff on March 14, 2004.

6          The motion on behalf of Mendoza, Rosales, Swan and Anunciacion is a different matter.

7   While Mendoza concedes that he participated in what he and Dizon characterize as an attempt to

8   restrain and subdue plaintiff, plaintiff nowhere identifies the guards who he asserts kicked him

9   and otherwise participated in Dizon's attack.  Therefore, there is no particular dispute for a jury to

10  resolve with respect to Mendoza.  Rosales, Swan and Anunciacion submit evidence that they did

11  not touch plaintiff on March 14.  Again, plaintiff presents no evidence any of them kicked, struck

12  or otherwise harmed plaintiff that date.  Therefore, there is no genuine issue for trial and their

13  motion must be granted.

14         **F.  Qualified Immunity**

15         Defendants allege that they are entitled to qualified immunity.  With respect to plaintiff's

16  claims of excessive force, Dizon is the only moving defendant who is not entitled to judgment as

17  a matter of law.  There is no need to consider the defense of qualified immunity with respect to

18  the claims upon which the court has resolved the summary judgment motion on merits in favor of

19  defendants.  *See Wilkie v. Robbins*, 127 S.Ct. 2588, 2608 (2007).  Thus, the court only considers

20  whether Dizon is entitled to qualified immunity on the two claims for which he would face trial.

21         A motion for summary judgment based on the defense of qualified immunity is analyzed

22  under the ordinary framework established for such motions.  *Butler v. San Diego Dist. Attorney's*

23  *Office*, 370 F.3d 956, 963 (9th Cir. 2004).  A defendant who makes a properly supported motion

24  for summary judgment based on the defense of qualified immunity shifts the burden such that

25  plaintiff must produce evidence in opposition.  *Butler*, 370 F.3d at 964.  Thus, in resolving

26  questions of qualified immunity on summary judgment, the court must decide whether, taking the

18

1    undisputed facts in the light most favorable to the non-moving party, it can be said that the

2    officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If,

3    and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask

4    whether the right was clearly established . . . in light of the specific context of the case."  *Id*.

5    Under the law and facts outlined above, if plaintiff's version of the events of March 14, 2004, is

6    credited, Dizon is not entitled to qualified immunity on either claim.

7         It is not necessary to recount all the facts here.  There is a genuine factual dispute about

8    the amount of force used and the justification therefor.  Plaintiff alleges that Dizon attacked him

9    for no reason and beat him seriously.  Dizon alleges that he felt threatened and decided to subdue

10   plaintiff by taking him down.  If plaintiff proves his version of events, he will be entitled to relief.

11   Thus, this claim survives the first part of the qualified immunity analysis.

12        With respect to the second prong, the court notes that the defense protects "all but the

13   plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335,

14   341 (1986).   The dispositive inquiry is whether it would be clear to a reasonable guard that his

15   conduct was unlawful in the situation he confronted.  *Saucier*, 533 U.S. at 205.  It is not necessary

16   that the exact conduct be proscribed at the time of the acts alleged.  *Hope v. Pelzer*, 536 U.S. 730,

17   739 (2002); *Mendoza v. Block*, 27 F.3d 1357 (9th Cir. 1994).  Rather, the question is whether the

18   "contours of the right" have been defined at a sufficient level of specificity such that in light of

19   the pre-existing precedent, the unlawfulness of the conduct is apparent.  *Anderson v. Creighton*,

20   483 U.S. 635, 640 (1987).   At the time of the events giving rise to this action, the law was clear

21   that force used sadistically and maliciously for the very purpose of causing harm violated the

22   Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).

23        Dispositive of the second prong of the analysis is that the factual dispute arises in large

24   part on plaintiff's assertion that he did nothing to warrant the use of physical force in the first

25   place.  As noted above, the *Whitley* standard was clearly established at the time of the events

26   giving rise to this action.  Under the analysis used to apply that standard, it should go without

1   saying that although a guard need not wait to be attacked before using force, *see McCrary-El v.*

2   *Shaw*, 992 F.2d 809, 812 (8th Cir. 1993), his unprovoked assault on a prisoner violates the Eighth

3   Amendment.  *See Pelfrey v. Chambers*, 43 F.3d 1034 (6th Cir.), *cert. denied*, 515 U.S. 1116

4   (1995) (allegations that guard approached inmate, who was opening his mail, with a knife and

5   restrained him and cut his hair with the knife stated claim for excessive use of force).  On the

6   record presently before the court and assuming plaintiff's testimony is believed, it cannot be said

7   that a reasonable guard in the situation Dizon confronted would have believed his conduct was

8   lawful.  Dizon is not entitled to qualified immunity on this claim.

9   **IV.    Conclusion**

10          For the reasons explained above, the court finds that there is no genuine issue for trial with

11  respect to plaintiff's first and second claims, but there is with respect to his three other claims.

12  Furthermore, defendant Dizon is not entitled to qualified immunity.  Dizon and Powers are the

13  defendants against whom plaintiff has claims for a jury to resolve.

14          Accordingly, it is hereby RECOMMENDED that:

15          1.  Defendants' February 2, 2007, motion for summary judgment be granted in part and

16  denied in part as follows:

17                  a.  Dizon's motion for summary judgment be granted with respect to the claim that

18  he used excessive force against plaintiff  at around 12:30 a.m. on March 4, 2004;

19                  b.  Dizon and Powers's motion for summary judgment be granted with respect to

20  the claim that they used excessive force against plaintiff  at around 4:30 a.m. on March 4, 2004

21  March 5, 2004;

22                  c.  Dizon motion for summary judgment be granted with respect to the claim that

23  he used excessive force against plaintiff March 5, 2004;

24                  d.  Dizon's motion for summary judgment be denied with respect to the claims that

25  he used excessive force against plaintiff on March 14, 2004;

26  ////

e.  Annunciacion, Barrientos, Mendoza, Rosales and Swan's motion for summary judgment on the claim that they used excessive force against plaintiff on March 14, 2004, be granted; and,

2.  Plaintiff be given 30 days to file a pretrial statement, and Dizon and Powers be given 15 days from service thereof to file a pretrial statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 4, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE