IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES H. FISHER,

        Plaintiff,          No. CIV S-05-0540 MCE EFB P

   vs.

N. DIZON, et al.,

        Defendants.          <u>FINDINGS AND RECOMMENDATIONS</u>

                                /

      Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. Currently under consideration is defendant Powers' motion for summary judgment. For the reasons explained below, this motion must be granted.

**I. Procedural History**

      This action proceeds on the March 31, 2005, verified complaint in which plaintiff alleged that Dizon and other guards would approach his bunk at night, awaken plaintiff and fling pocket knives in the area of his bed. In particular, he alleges that at around 12:35 a.m., on March 5, 2004, Dizon approached plaintiff's bunk, shone a light in plaintiff's eyes, held a knife over plaintiff's head, shook the bunk and poked plaintiff twice in the buttocks. Plaintiff further alleges that at around 4:30 a.m. on March 5, 2004, he complained about Dizon to Powers. All defendants but Powers moved for summary judgment on February 2, 2007. That motion was

1

granted, but Powers was given an opportunity to file a brief that addressed the summary judgment standards on the claim that pertains to him, i.e. that he failed to protect plaintiff. Dckt. # 65. On April 29, 2008, Powers filed the motion currently before the court.

**II. Facts**

Powers did not include a statement of facts with his motion. Thus, the court relies on the relevant facts included in the motion for summary judgment filed by the other defendants.[1] At all times relevant to this action, plaintiff was a prisoner confined at the California Medical Facility ("CMF"), and housed in Dorm 1 in Unit H-3 with 11 other prisoners. Defs.' Mot. for Summ. J., Exs. filed in Supp. Thereof ("Defs.' Ex."), Ex. A, Incident Report of 3/14/2004; Dizon Decl.,

¶ 26. Defendant Powers was a guard employed at CMF.

The defendants' actions in this case arise out of the process for counting prisoners. Relevant here is the "positive count," which consists of "the actual number of inmates that each respective staff member has counted and reported to Central Control." Defs.' Ex. B, CDCR Departmental Operations Manual ("DOM") 520204.3. Prisoners must be counted at least four times each day at times established in the DOM. DOM 52020.4. Thus, positive counts are to be conducted between 12:30 a.m. and 1:00 a.m.; 4:30 a.m. and 5:30 a.m.; 4:00 p.m. and 5:00 p.m.; and 9:00 p.m. and 10:00 p.m. DOM 52020.4.1. During what is known as a "standing count," which is done between 4:00 p.m. and 5:00 p.m., "inmates housed in cells shall stand upright at their cell door and shall remain standing until counted by the officer conducting the count." DOM 52020.4.2. Prisoners "housed in dormitories equipped with double tier bunks, shall remain seated on their assigned bunk until the count is completed by the officer." DOM

---

[1] All record citations for the facts are to the exhibits and declarations and the statement of undisputed facts in support of the original motion for summary judgment. Those exhibits are docket numbers 43-53. For the sake of convenience, the court will cite to sources of the facts using the same protocol as in the findings and recommendations on the initial motion for summary judgment.

2

1  52020.4.3.  No document specifies when a count is "completed."  However, defendants assert
2  that prisoners must remain on their bunks until guards finish counting and the last officer has left
3  the dormitory.  Kaplan Decl., ¶ 10; Dizon Decl., ¶ 14.  Guards counting prisoners must "ensure
4  that the individual inmate is awake, breathing and responsive."  Defs.' Ex. C, California Medical
5  Facility Operational Procedure ("OP") 4, at 4.  A prisoner will not be counted if staff is "unable
6  to confirm the inmate being counted is alive and breathing."  OP 4, at 4.

7      The record contains evidence in the form of Dizon's declaration explaining the security
8  precautions taken during a positive count made on first watch.  To count prisoners in a
9  dormitory, guards must enter the dormitory.  One guard remains in the main hall outside the
10 housing wing.  Dizon Decl., ¶ 9.  The door leading into the housing wing remains locked, and
11 the "key" officer holds the keys for all the wings, dormitories and cells where prisoners are to be
12 counted.  *Id.*  To count the prisoners in a dormitory, the guard stationed in the hallway unlocks
13 the door to the dormitory, two to four guards enter, and the wing officer locks the door after
14 them.  *Id.*, ¶ 10.  One guard, the "wing officer," counts the prisoners while the other officers,
15 "cover officers," protect him.  *Id.*  Since it was dark in the dormitory, Dizon used a flashlight to
16 verify that each prisoner was present and alive, and while it was not his practice to shine the light
17 in a prisoner's eyes, it could have happened on occasion.  *Id.*, ¶ 25.  Dizon asserts that during
18 counts he does not touch a sleeping prisoner with his hand or any object because startling a
19 sleeping prisoner can lead to a dangerous incident.  Dizon Decl., ¶ 24.

20     Compounding prison officials' concerns for security during a count was a habit of
21 prisoners, at the time of these events in dispute here, of hanging "curtains" on clotheslines
22 around their bunks.  Dizon Decl., ¶¶ 15, 16; Rosales Decl., ¶ 13; Swan Decl., ¶ 11.  This practice
23 required the wing officer to move whatever was hanging on the line.  Dizon Decl., ¶ 15.  Thus,
24 Sergeant Powers authorized guards to cut down curtains and clotheslines that hindered the ability
25 to count prisoners.  *Id.*, at 17; Rosales Decl., ¶ 14; Swan Decl., ¶ 11.  Dizon asserts that he
26 carried what is known as a "cut down tool," which he used for cutting curtains and clotheslines

3

to facilitate the count. *Id.*, at 18. A "cut down tool" has the shape of "a curved version of the number six," and specifically is designed to cut a noose in order to prevent a suicide. *Id.* The lower part of the tool is an oval-shaped handle of about 3/4 of an inch thick. *Id.* The top part is curved, about 3/4 of an inch thick with "a razor-like device angled upward toward the center inside curve of the top of the 'six.'" *Id.* This upper, sharp portion is used for cutting. *Id.* Dizon denies ever having used anything other than a cut down tool to cut an prisoner's clothesline. Dizon Decl., at ¶ 22. At deposition, plaintiff explained that the instrument was like a box cutting tool. Defs.' Ex. G, Dep. of Plaintiff ("Pl.'s Dep."), at 14.

For the most part, defendant Dizon avoids the use of specific dates in his declaration. He states that about a week before the March 14, 2004, incident, when Dizon cut plaintiff's clothesline on which a sheet was hanging, plaintiff began pulling on the sheet. Dizon Decl., ¶ 23. Dizon tugged back, but ultimately let go in order to avoid a violent incident. *Id.* That day, plaintiff complained to Sgt. Powers about the what had happened. *Id.* Dizon denies knowing who plaintiff was before this incident. *Id.*

On March 4, 2004, during "first watch," guards conducted two positive counts. Kaplan Decl., ¶¶ 5-6. They completed the first count by approximately 1:00 a.m., and the second by approximately 5:00 a.m. *Id.* In the verified complaint, plaintiff alleges that at around 12:30 a.m., he was awakened by unspecified staff "and Dizon wielding and flinging knives in my bed area, and snatching on the bunk as they cut away my towel line." Compl., at 4. At deposition he retracted this allegation stating that Dizon did not thrust the knife. Pl.'s Dep., at 14. Rather, Dizon "used the cutting knife on string. He cut away a string. He cut away a towel, my towel string." *Id.* Plaintiff admitted that at this time he did not see the cutting tool. *Id.*, at 17. He just felt the bunk move when the string was cut away. *Id.* At 4:30 a.m., the same guards returned with the sergeant, defendant Powers. *Id.* As they approached plaintiff's bunk, Dizon pointed at plaintiff and said, "That's him." Compl., at 5. Powers then took a knife out of his pocket and
////

4

1 cut a clothesline from plaintiff's bunkmate's bed with such force as to shake the entire bunk bed. *Id.*

Defendant Dizon does not specify a date, but does not dispute that at least once during the first week of March 2004, he was working the first positive count of the first watch. Dizon Decl., ¶ 23. He used a "cut down" tool to cut a clothesline on plaintiff's bunk. *Id*., ¶ 23; Swan Decl., ¶¶ 14-15. Plaintiff had hung a sheet on the line, and the sheet obstructed the view of plaintiff's bunk. Dizon Decl., ¶ 23; Swan Decl., ¶¶ 14-15. While Dizon was cutting the sheet, plaintiff began to pull on it. Dixon Decl., ¶ 23; Swan Decl., ¶¶ 14-15. This continued so that they essentially were in a tug-of-war. Eventually, Dizon let plaintiff have the sheet so as to avoid having the situation escalate. Dixon Decl., ¶ 23; Swan Decl., ¶¶ 14-15. The court construes these facts as pertaining to the first incident on March 4 because this was the only time it appears that Dizon cut a clothesline attached to plaintiff's bunk.

The verified complaint also alleges that on March 5, 2004, at around 12:35 a.m., Dizon and other, unidentified guards returned. Compl., at 5. Plaintiff was awake. *Id.* His towel was folded and on the floor. *Id.* He had nothing hanging up, but "Dizon walked up to my head area and shined his high-intensity flash light directly into my eyes." *Id.* Plaintiff blocked the light with one hand. Dizon shook the bunk with the hand in which he was holding a knife. *Id.* Dizon then went to the other side of the bunk, shook the bunk with both hands, poked plaintiff in the buttocks and walked away. *Id.* Plaintiff asserts that the second poke "penetrated the crack and cheeks" of his buttocks. Compl., at 6. At deposition, plaintiff testified that Dizon touched him with some object, which could have been a baton or a flashlight. Pl.'s Dep., at 35.

**III. Summary Judgment Standards**

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

////

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing

party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.   In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).   The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be

7

drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

On January 18, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**IV. Analysis**

As noted, the only claim remaining in this action is that on March 5, 2004, plaintiff complained to defendant Powers about Dizon's conduct and Powers refused to take any action to protect plaintiff from Dizon.  Powers contends that since this court found that Dizon did not violate plaintiff's rights, there was no constitutional harm from which he was obliged to protect plaintiff.  Thus, his failure to act did not violate plaintiff's rights.  Plaintiff disagrees, contending that Powers' failure to protect was a constitutional violation in and of itself.  It is clear that the Eighth Amendment requires that the conditions of a prisoner's confinement, even if harsh, have some legitimate penological purpose.  *See Hudson v. Palmer*, 468 U.S. 517, 584 (1984); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Prison officials violate the Eighth Amendment's prohibition on cruel and unusual punishment if they are deliberately indifferent to a risk of harm that "is not one that today's society chooses to tolerate." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  The Supreme Court has noted that confinement "strips [prisoners] of virtually every means of self-protection." *Farmer*, 511 U.S. at

8

833-34.  Moreover, assaults on prisoners which have no relation to maintaining or restoring order cannot be said to serve any legitimate penological interest.  *See Whitley v. Albers*, 475 U.S. 312, 320-23 (1986).  To be deliberately indifferent, a prison official must know of, or infer from the circumstances, a risk of harm or injury that "is not one that today's society chooses to tolerate," yet fail to take reasonable actions to mitigate or eliminate that risk.  *Farmer*, 511 U.S. at 837; *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

On the facts set out above, this court found that there was no genuine issue for trial about whether his actions violated contemporary standards of decency on any of the occasions plaintiff alleges.  With respect to the first incident of March 4, 2004, plaintiff conceded that Dizon cut an unauthorized clothesline away from plaintiff's bunk.  He also conceded that Dizon did not misused a knife or any other sharp object.  March 4, 2008, Findings & Recommendations, at 14:12-13.  As to the second incident that morning, the court found that the most plaintiff could prove was that Dizon pointed to plaintiff and said, "That's him," while Powers cut down the clothesline attached to a different prisoner's bunk.  *Id.* at 14-15.  Furthermore, on March 5, 2004, Dizon poked plaintiff in the buttocks and there was a dispute about whether Dizon shone a light in plaintiff's eyes during the count, as a matter of law this conduct was not objectively cruel and usual.  Thus, none of Dizon's conduct was wanton or placed plaintiff at a constitutionally unacceptable risk of harm.  This being the case, there was no unacceptable risk of harm to which Powers could have been deliberately indifferent.  Therefore, there is no genuine issue for trial on plaintiff's claim against Powers.  Defendant Powers is entitled to judgment as a matter of law.

**IV.  Conclusion**

For the reasons explained above, there is no genuine issue about whether Powers was deliberately indifferent to plaintiff's need for safety.

////

////

////

9

Accordingly, it is hereby RECOMMENDED that:

1. Defendant Powers' April 29, 2008, motion for summary judgment be granted;

2. Judgment be entered in his favor; and,

3. The Clerk be directed to close the case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 25, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

10